[Cite as *State v. Coleman*, 2026-Ohio-965.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

          Plaintiff-Movant

- vs -

MALIKHI JERMAINE COLEMAN,

          Defendant,

        and

WILLIAM B. NORMAN,

          Respondent.

**CASE NO. 2024-A-0040**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2022 CR 00416

---

## DECISION ON SANCTIONS AND JUDGMENT ENTRY

Decided: March 20, 2026
Judgment: Sanctioning Attorney for Misconduct

---

*April R. Grabman*, Ashtabula County Prosecutor, and *Dane R. Hixon*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Movant).

*Joseph P. Dunson*, Weyls Peters + Chuparkoff, L.L.C., 6505 Rockside Road, Suite 105, Cleveland, OH 44131 (For Respondent).

EUGENE A. LUCCI, J.

### INTRODUCTION

{¶1} On October 9, 2025, after movant, the State of Ohio, and respondent, Attorney William B. Norman (OH Atty. Regis. No. 0088113), entered into a settlement agreement relating to respondent's motion for sanctions, this court entered a judgment

directing movant to file a transcript of the August 28, 2025 hearing and ordering the parties to file briefs regarding the gravity of the violations admitted by respondent. On November 7, 2025, the parties filed their respective briefs, and respondent was afforded additional time to submit a reply brief on certain issues raised by movant. Respondent filed the reply brief on November 21, 2025. This court determined that a post-briefing hearing is unnecessary. The following sequence of events and findings of fact are the foundations for this court's determination on sanctions.

### CHRONOLOGY OF THE UNDERLYING MATTER

{¶2}   On February 18, 2025, in *State v. Coleman*, 2025-Ohio-513 (11th Dist.), this court affirmed the convictions of the appellant in this matter, Malikhi Jermaine Coleman, for murder, discharge of a firearm on or near prohibited premises, and improperly handling a firearm in a motor vehicle, with firearm specifications. On May 19, 2025, respondent, counsel for Mr. Coleman, filed an application to reopen, supported by an affidavit executed by Attorney Norman on May 19, 2025, in which he swore, under penalty of perjury, to the truth of the factual and legal bases of the application. Certain allegations and features of this application are at the heart of the instant proceedings.

{¶3}   In its reply to the application, on May 23, 2025, movant recognized and acknowledged several factual allegations made by respondent that were false and premised upon quotations that did not appear in the record. Movant concurrently and separately moved for sanctions based upon the false representations of alleged statements made by the prosecution that did not appear in the record:

> Far and away the most concerning part of Appellant's brief is that he inaccurately cites to the record. Appellee, despite significant effort, has not been able to locate either of the quotes attributed to the prosecutor on pages 2 and 4 of

Appellant's brief in the record, and upon examination, page 559- the page Appellant cites to on page 4 for the "legally inflammatory" statement by the prosecutor- is, in fact, the court reporter's signature page, with no statements of any type by the prosecutor. Appellee has searched through the trial transcripts as a whole for these statements, and has not located them. Appellee has also had three members of staff attempt to find these quotes, with no success. Using the same method on the correct quotes on page 6, Appellee has located them within minutes. Appellee also cannot find a "summation" listed in the record. Indeed, the closest quote Appellee could find was when the prosecutor stated "He even admits he has that AK-47 and he's the one who shoots at Freddie Johnson. Did cause the death of Freddie Johnson as a proximate result of committing felonious assault" on page 656 of the trial transcripts. This is a significantly less inflammatory statement, and makes no mention of an alleged "duty to retreat." Appellant has therefore misled this Court. This is a sanctionable offense, and not one to be taken lightly.

State's Opposition to Application to Reopen at p. 6.

Appellant cites to two quotes in the Application to Reopen which appear not to exist. As such, Appellee and government staff have wasted significant time in attempting to track down these quotes and replying to a brief predicated on fabrications. Additionally, Appellant's counsel has failed in his ethical duties by misleading this Court, in violation of Rule 3.3 of the Ohio Rules of Professional Conduct. Appellee notes that these false claims are brought in the light of prosecutorial misconduct and ineffective assistance of both trial and appellate counsel; thus, these false claims implicate the reputation and careers of no less than three attorneys. Even more concerning is that Appellant's counsel may have done similarly in prior cases; the Eighth District in *State v. Boyd*, 2025-Ohio-617[,] ¶ 49 (8th Dist.), in which Appellant's counsel was also counsel for Boyd, noted that several of Boyd's claims "[rest] upon a misreading of the transcript and jury instructions."

Appellee therefore requests sanctions in the amount of $6,000, representing the time Appellee's counsel and staff spent responding to the application, dismissal of this application, and any further sanctions as this Court feels would be appropriate to the gravity of this situation.

Case No. 2024-A-0040

Alternatively, Appellee requests that this Court hold a hearing to determine the nature of sanctions.

State's Motion for Sanctions at pp. 1-2.

{¶4} On June 25, 2025, this court filed two judgment entries, one overruling the application to reopen and the other ordering respondent to show cause regarding why sanctions should not be ordered. In the judgment denying the application to reopen, this court underscored that respondent, acting as Mr. Coleman's counsel, cited alleged features of the transcript purportedly demonstrating prosecutorial misconduct. This court recognized that the cited portions of the transcript did not include the inflammatory statements ascribed to the prosecutor.

{¶5} In the judgment ordering respondent to show cause, this court determined the prosecutor never made the statements alleged by respondent. This court acknowledged movant's claim that the alleged statements were "predicated on fabrication" and that sanctions should be ordered. As such, respondent was ordered to show cause why sanctions should not be pursued.

{¶6} On July 10, 2025, respondent admitted a member of his staff used Artificial Intelligence ("AI") tools, which improperly generated "hallucinated" quotes that did not exist. Respondent stated he had taken steps to ensure AI would be properly used in future cases to avoid repeating the error. Respondent proffered his firm's purported new AI policy as an exhibit to his show-cause response. As discussed *infra*, the policy itself bore the hallmarks of having been generated by an AI platform, including generic boilerplate language, unfilled bracketed placeholder fields such as "[Insert Date]," and a scope that precisely tracked the issues in this case while omitting other critical governance considerations. This court set the matter for hearing on August 28, 2025.

Case No. 2024-A-0040

{¶7}   During the August 2025 hearing, this court heard from movant's counsel and respondent's counsel. Of significant note, respondent's counsel admitted "[t]his is a serious matter. We shouldn't be here. We're here because [respondent] screwed up." T.p. 9. Respondent apologized for his actions and asserted such an error would not happen again.

{¶8}   Counsel for respondent further stated that respondent "is not a babe in the woods when it comes to AI, and he was not a babe in the woods when it comes to AI when this happened. He understands the difference between a public AI generative tool like ChatGPT, and a proprietary fee subscription based AI tool like Westlaw." *Id.* at 10. Respondent explained that he advised his staff not to upload sensitive materials to public AI generative tools, but his staff did so anyway. Despite respondent's apparent knowledge and awareness of the AI platforms and their dangers, he failed to review the application filed in this court (which was prepared by a non-attorney staff member). Counsel for respondent stated, "At that point, it was [respondent's] responsibility to read that brief, to look at those quotes, to stop and say those aren't real, or let me investigate. That's where he failed. He didn't catch it . . . . He didn't catch the hallucinated quotes. That was wrong. That's his responsibility." *Id.*

{¶9}   Later, this court was informed that the parties entered into a settlement agreement, which was filed simultaneously with movant's withdrawal of its motion for sanctions.

{¶10}   On October 9, 2025, this court filed an order noting that it was not bound by the terms of the parties' settlement agreement. This court ordered movant to file the transcript of the August 2025 hearing; this court also ordered the parties to file briefs

regarding the gravity of the violations and the applicable good faith or bad faith of respondent's misconduct. The transcript of proceedings was filed on October 20, 2025. Moreover, the parties filed their respective briefs on November 7, 2025.

{¶11} In its brief, movant observed it had "discovered that [respondent's] new policies and procedures [relating to AI] are not proving effective." To this point, movant identified a "Motion to Withdraw a Guilty Plea," filed by respondent in *State v. Saker*, CR-25-701703-A, in the Cuyahoga County Court of Common Pleas. In that motion, filed on October 29, 2025—two months after the sanctions hearing in this court—respondent cited questionable citations, one of which could not be found. Movant also pointed out that, at the end of one section of respondent's Cuyahoga County motion, the following quote occurs: "Would you like me to draft the next argument section (e.g., argument 1 – B on the 'nature of the charge' omission) in the same tone and format so your brief reads as a seamless multi-print memorandum?" Movant submitted that such statements are found at the end of output prepared by the AI platform ChatGPT—the very platform at issue in this case.

{¶12} In its brief, movant emphasized the seriousness and gravity of the misconduct, pointing out this court's observation that if respondent's conduct was intentional, it could be criminal. *See, e.g.*, *Disciplinary Counsel v. Stafford*, 2012-Ohio-909 (suspending an attorney who recklessly made false statements to a court). Movant argued respondent's misconduct was therefore committed "willfully" or in "bad faith."

{¶13} Movant additionally noted that respondent was on notice that the application for reconsideration filed in this matter contained spurious quotations but still he did not withdraw the application or amend the same. Movant also pointed out that respondent

admitted he was not unfamiliar with public AI platforms but apparently ratified such usage in the preparation of the application to this court. Movant additionally underscored that respondent implemented new policies on AI usage but continued to use the platform in the Cuyahoga County matter after the August 28, 2025 hearing.

{¶14}  Next, movant directed this court to its concern that, after learning that a paralegal in respondent's firm prepared the application at issue, such preparation might rise to the level of unauthorized practice of law. By his own admission, respondent did not adequately review the filing prepared by the paralegal before filing it. Movant, while touching on the problems relating to a paralegal practicing law, additionally highlighted the ethical pitfalls of an attorney failing to or inadequately reviewing filings prepared by a non-lawyer.

{¶15}  In respondent's brief, he again recognized the seriousness of the matters but claimed he did not act with ill intent or bad faith. Respondent averred he did not act with a dishonest purpose or conscious wrongdoing. Still, respondent recognized and admitted his paralegal prepared the application and he "made a mistake—albeit a serious one—by not catching the AI hallucination generated by his para-professional . . . ." Ultimately, respondent maintained this court should not issue additional sanctions because he (1) admitted his misconduct and was apologetic, and (2) he and movant settled movant's fee claim for $2,000. Respondent requested this court to afford him additional time to respond to movant's citation of *Saker* and its arguments vis-à-vis unauthorized practice of law. Movant agreed that respondent should have the opportunity to respond to these points, and this court granted the request.

{¶16} On November 21, 2025, respondent filed his reply brief in response to the foregoing issues. In relation to movant's citation to *Saker*, respondent acknowledged the filing identified by movant. He pointed out, however, he withdrew the motion after catching "his mistake in e-filing the draft with inaccurate AI information." Respondent observed he moved to strike the original motion and filed a separate motion without the possible citation errors and alleged AI prompting. Respondent maintained the original filing was an early draft that was accidentally filed.

{¶17} Respondent further argued that "*Saker* has nothing to do with this case." He maintained that the Cuyahoga County Court of Common Pleas has jurisdiction over whether he should face any consequences for filing the initial motion and therefore his actions or omissions in that case are not the business of this court.

{¶18} Next, in response to movant's points relating to the possibility of unauthorized practice of law, respondent argued that "[t]his court cannot issue an order that suspends [respondent's] law license . . . ." As such, he asserted this court lacks the authority "to investigate or determine" an unauthorized practice of law claim.

{¶19} Respondent, however, acknowledged his paralegal or "para-professional" is not an attorney and that respondent is responsible for supervising his "non-lawyer subordinate." Respondent recognized he failed to properly supervise his paralegal by "not adequately reviewing the draft of the application to re-open . . . ." Respondent admitted his paralegal uploaded the draft of the application to ChatGPT, a public generative AI tool, and the public tool "hallucinated" inaccurate trial transcript quotes that were improperly attributed to the prosecutor in closing argument at trial. While respondent asserts that he reviewed the application, he "did not catch the hallucinated transcript quotes."

Case No. 2024-A-0040

Respondent concedes he should have "caught them." And "his failure to catch them resulted in the submission of inaccurate data for this court's consideration."

{¶20} Respondent acknowledges this court's discretion to order sanctions but exhorts the court to refrain from doing so.

## FACTUAL FINDINGS

{¶21} Based upon the filings, admissions, briefs, and the transcript of the August 28, 2025 hearing, this court makes the following factual findings:

{¶22} On May 19, 2025, respondent filed an application to reopen the appeal of Malikhi Jermaine Coleman in this court. The application alleged prosecutorial misconduct during closing argument at trial and cited specific quotations from the trial transcript purportedly demonstrating that the prosecutor had made inflammatory, improper statements.

{¶23} The alleged quotations attributed to the prosecutor did not appear in the trial transcript. The statements were entirely fabricated. They were not paraphrases, approximations, or loose characterizations of actual statements; they were wholesale inventions that bore no resemblance to the record. Movant and this court, however, used time and resources in an attempt to verify the statements.

{¶24} The fabricated quotations were generated by ChatGPT, a publicly available generative artificial-intelligence platform. Respondent's paralegal, a non-attorney staff member, uploaded materials relating to the case to ChatGPT and used the platform's output in preparing the application to reopen. The AI tool produced false transcript quotations—a phenomenon known as "hallucination"—and these fabricated quotations were incorporated into the filing submitted to this court.

{¶25} The fabricated quotations did not merely misrepresent the record in the abstract. They ascribed specific, inflammatory statements to an identifiable individual—the trial prosecutor—that were never uttered. The fabricated quotations also impugned the trial judge, implying that the court permitted improper prosecutorial statements without correction, limiting statement, or other remedy. And the application's claim of ineffective assistance of appellate counsel on direct appeal necessarily impugned prior appellate counsel, suggesting that counsel had failed to raise a meritorious claim of prosecutorial misconduct. The statements were never made. They were hallucinations that respondent did not check or address. Moreover, movant brought the hallucinations to respondent's attention in its responsive filing. Respondent still did not withdraw the allegations. These were not victimless fabrications. They constituted defamatory allegations against real persons and officers of the court as well as the court itself.

{¶26} Respondent was not unfamiliar with artificial intelligence tools. His own counsel conceded at the August 28, 2025 hearing that respondent "is not a babe in the woods when it comes to AI" and that he "understands the difference between a public AI generative tool like ChatGPT, and a proprietary fee subscription based AI tool like Westlaw." T.p. 10. Respondent was aware, or should have been aware, of the well-documented risks of AI hallucination, including the generation of fabricated legal citations, false quotations, and fictional case holdings.

{¶27} Despite this knowledge, respondent permitted a non-attorney staff member to use a public generative AI tool in the preparation of a filing to this court without adequate supervision, training, or verification protocols. Respondent has admitted to his omissions and conduct.

{¶28} Respondent did not independently verify the quotations attributed to the prosecutor against the trial transcript before filing the application. This failure occurred despite respondent's obligation as the attorney of record to ensure the accuracy and veracity of all filings bearing his signature and submitted to a court, to which he swore in an affidavit.

{¶29} The fabricated quotations were not minor or inconsequential. They formed the substantive core of the application to reopen, which alleged prosecutorial misconduct—a serious allegation that, if substantiated, could have resulted in the reopening of a final, appellate judgment and, potentially, reversal of Mr. Coleman's convictions. The false quotations, had they been afforded credibility, would have constituted a fraud upon this court and a grave injustice against the prosecution and the administration of justice.

{¶30} When movant identified the fabrications in its reply brief and moved for sanctions, respondent did not withdraw the application, amend the filing, or notify the court of the errors. More than one month elapsed between the filing of the motion for sanctions and this court's ruling, during which time respondent took no corrective action. This fact is relevant and significant to this court's findings.

{¶31} Respondent's remedial measures, including the creation of an internal AI policy and completion of continuing legal education courses on AI, were undertaken only after movant requested sanctions. These measures were reactive, not proactive. Moreover, the AI policy proffered by respondent bore the hallmarks of having itself been generated by an AI platform. The policy contained unfilled bracketed placeholders such as "[Insert Date]" where respondent's own firm-specific information should have

appeared, inconsistent formatting, typical of AI-generated templates, redundant language, and a scope that precisely mirrored the issues in this case while omitting other critical AI governance considerations. Respondent did not appear to take the minimal step of substituting his firm's actual data where the AI tool had placed brackets indicating customization was required. The proffering of an AI-generated AI policy as a remedial measure in a case involving the submission of AI-generated fabrications to this court is, at best, ironic. It suggests that respondent's engagement with the consequences of his misconduct has been superficial.

{¶32} Despite the August 28, 2025 sanctions hearing in this court, respondent continued to use ChatGPT in his legal practice. On October 29, 2025—two months after the hearing—respondent filed a "Motion to Withdraw a Guilty Plea" in *State v. Saker*, CR-25-701703-A, in the Cuyahoga County Court of Common Pleas. That motion contained at least one citation that could not be located and, critically, included a ChatGPT prompt embedded in the text of the filing itself: "Would you like me to draft the next argument section (e.g., argument 1 – B on the 'nature of the charge' omission) in the same tone and format so your brief reads as a seamless multi-print memorandum?" This language is unmistakably the output of a generative AI platform, not the work product of an attorney.

{¶33} Respondent acknowledged the *Saker* filing but characterized it as an inadvertently filed early draft. He maintained that he later withdrew the motion and filed a corrected version. Regardless of whether the filing was accidental, the *Saker* filing demonstrates that respondent's self-imposed corrective measures were not effective in preventing the recurrence of AI-related errors in his practice. And respondent appears to believe this court has no "jurisdiction" to consider the subsequent act of unmonitored AI

use in the Cuyahoga County matter. Respondent's action occurred after this court's hearing relating to the underlying matter and is therefore relevant to our consideration on sanctions.

{¶34} Of critical importance, after this court denied respondent's application to reopen on June 25, 2025, respondent filed an appeal of that denial to the Supreme Court of Ohio on August 6, 2025 (Case No. 2025-1020). In pursuing that appeal, respondent did not withdraw or amend the application containing the fabricated quotations. Nor did respondent inform the Supreme Court of Ohio that the application to reopen—the very filing from which respondent sought to challenge our denial—had been predicated upon fabricated transcript quotations generated by an AI tool. Respondent thus doubled down on the filing, effectively asking the Supreme Court to review this court's denial of an application that respondent knew, or should have known, was, in part, built upon false representations. Rather than correcting the record, respondent perpetuated the false narrative by challenging the denial without candor about the infirmity of the underlying filing. Respondent never withdrew the notice of appeal. This conduct is relevant both to respondent's good faith and to the scope of harm caused by his misconduct. The Ohio Supreme Court, on October 14, 2025, declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).

{¶35} Respondent has acknowledged and admitted that: (a) his paralegal used ChatGPT to prepare the application to reopen; (b) the AI tool generated hallucinated transcript quotations; (c) respondent failed to verify the quotations before filing; (d) the quotations were false and did not appear in the record; (e) the filing constituted a serious error; and (f) respondent bears full responsibility for the content of the filing.

{¶36} The parties entered into a settlement agreement whereby respondent agreed to pay $2,000 to the Ashtabula County Prosecutor's Office. Movant simultaneously withdrew its motion for sanctions. This court, however, noted in its October 9, 2025 order that it is not bound by the terms of the parties' settlement agreement. The court's obligation to protect the integrity of the judicial process is independent of, and cannot be compromised by, a private agreement between litigants.

{¶37} Respondent has additional matters currently pending before this court. His conduct in this case, if left unsanctioned, could continue to affect the administration of justice in this court across those matters.

## CONCLUSIONS OF LAW

### I. SOURCES OF JUDICIAL AUTHORITY

{¶38} Before addressing the specific violations, this court identifies the sources of authority upon which it relies in addressing respondent's misconduct.

### A. The Inherent Authority of Courts

{¶39} It is well established that courts possess inherent authority to manage proceedings essential to their function, to control the conduct of those who appear before them, and to sanction conduct that abuses the judicial process. This authority exists independent of statute or rule. Inherent powers are those "'necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980), quoting *United States v. Hudson*, 11 U.S. 32 (1812). These powers derive from the "control necessarily vested in courts to manage their own affairs . . . ." *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630 (1962). Such power does not only exist in trial courts, but in appellate courts as well. *Great Am. Life Ins. Co. v. Shenkin*, 2015 WL 13928758, *2 (6th Cir. June 15, 2015)

(an appellate "court possesses inherent powers to sanction a party"). As the United States Supreme Court explained in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991):

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34 . . . (1812); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 . . . (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227 . . . (1821); see also *Ex parte Robinson*, 19 Wall. 505, 510 . . . (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 . . . (1962).

{¶40} The Court held that this inherent power includes the ability "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers* at 44-45. The inherent authority is "'particularly appropriate when the offending parties have practiced a fraud upon the court.'" *Id.* at 44, quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 124 F.R.D. 120, 139 (W.D.La. 1989). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers* at 44. This court is mindful that inherent powers must be exercised with restraint and discretion. Each sanction imposed herein is individually justified, serves a distinct remedial or protective purpose, and is calibrated to the specific harms caused by respondent's misconduct. That respondent settled the movant's fee claim does not address the institutional harm to this court, the reputational harm to the individuals defamed by the fabricated quotations, or the systemic risk posed by the continued submission of unverified AI-generated content. A private settlement between litigants

cannot remediate harm to the court itself or to the administration of justice—interests that belong to the public, not the parties.

{¶41} The ancient origin of a court's inherent authority was underscored in *Link v. Wabash Railroad Co.*, 370 U.S. 626, 629-630 (1962), where the Court observed that the power to sanction "is of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law, e.g., 3 Blackstone, Commentaries (1768), 295-296, and dismissals for want of prosecution of bills in equity, e.g., *id.*, at 451." The Court confirmed that this authority is "an inherent power," governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs. *Id.* at 630.

{¶42} In *Roadway Express*, 447 U.S. at 764, the Court extended this authority to the assessment of attorney fees, recognizing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices." Quoting *Link* at 632. Critically, the Court held that inherent powers "are those which 'are necessary to the exercise of all others,'" *Roadway Express* at 764, quoting *Hudson*, 11 U.S. 32, and that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." (Citations omitted.) *Roadway Express* at 764. The Court acknowledged that "bad faith" for purposes of inherent-authority sanctions is not restricted to the filing of the action itself: "'"[B]ad faith" may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.'" *Id.* at 765, quoting *Hall v. Cole*, 412 U.S. 1, 15 (1973). And the Court made plain that the power over attorneys is at least as great as that over litigants: "If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes." (Citation omitted.) *Roadway Express* at 766.

{¶43} Critically, the Supreme Court held in *Chambers* that the availability of other sanctioning mechanisms, whether statutory or rule-based, does not displace the court's inherent power. *Chambers*, 501 U.S. at 49-50. The Court further refined the limits of inherent authority sanctions in *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107-108 (2017), holding that fee awards under inherent authority should be compensatory rather than punitive and that a causal link must exist between the misconduct and the fees incurred. This court is mindful of this limitation in crafting the sanctions herein.

## B. Ohio Constitutional and Statutory Authority

{¶44} The Ohio Constitution, Article IV, Section 5, vests the Supreme Court of Ohio with rule-making authority and general superintendence over all courts in the state. This constitutional foundation provides the underpinning for the procedural authority exercised by all Ohio courts. Ohio appellate courts, as courts created by the Ohio Constitution, Article IV, Section 1, possess inherent powers necessary to effectuate their constitutional functions.

{¶45} R.C. 2705.02 authorizes courts to punish contempt of court. Ohio appellate courts have recognized that contempt statutes codify, rather than create, the inherent contempt power. *See, e.g.*, *Ex parte Robinson*, 86 U.S. 505, 510 (1873) ("The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice.").

{¶46} R.C. 2323.51 provides authority to award attorney fees and expenses for frivolous conduct, which includes conduct that is not warranted under existing law and

cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or assertions that lack evidentiary support.

{¶47} The Supreme Court of Ohio has recognized that a court's inherent power to address attorney misconduct is distinct from, and coexists with, the Supreme Court's exclusive authority over attorney discipline. In *Mentor Lagoons, Inc. v. Rubin*, 31 Ohio St.3d 256, 259-260 (1987), the Court held that a trial court has the "'inherent power to regulate the practice before it and protect the integrity of its proceedings,'" including the "'"authority and duty to see to the ethical conduct of attorneys."'" *Id.,* quoting *Royal Indemn. Co. v. J.C. Penney Co.*, 27 Ohio St.3d 31, 33-34 (1986), quoting *Hahn v. Boeing Co.*, 95 Wash.2d 28, 34 (1980). This includes the inherent authority of dismissal or disqualification from a case if an attorney cannot or will not comply with his professional obligations when representing a client. *Mentor Lagoons* at 259*.* The Court was emphatic: "This power is distinct from the exclusive authority of the Supreme Court of Ohio over attorney disciplinary proceedings, and does not conflict with such power." (Citation omitted.) *Id.* Indeed, the Court hastened to "approve and encourage courts throughout this state in their efforts to halt unprofessional conduct and meet their responsibilities in reporting violations . . . ." *Id.* at 260.

{¶48} In *Royal Indemn. Co.* at 34*,* the Supreme Court of Ohio confirmed that "[d]isciplinary proceedings, contempt sanctions and court revocation of pro hac vice privileges are distinct, but not exclusive methods of addressing attorney misconduct." (Citations omitted.) The Court recognized that while it exercises exclusive jurisdiction over the admission and discipline of attorneys under Section 2(B)(1)(g), Article IV of the Ohio Constitution, "a trial court retains the 'authority and duty to see to the ethical conduct of

attorneys in proceedings before it.'" *Id.*, quoting *Hahn* at 34.[1] The Court further observed that an attorney may face sanctions from a trial court and discipline from the Supreme Court for the same conduct, because "revocation of pro hac vice admissions, disciplinary procedures and contempt sanctions are separate and distinct methods of addressing attorney misconduct, and the appropriateness of one is not dependent on the availability of another." *Royal Indemn. Co.* at 34.

{¶49}  Ohio appellate courts have applied these principles directly. In *DiCuccio v. Lindsmith*, 2018-Ohio-2320, ¶ 30 (10th Dist.), the court confirmed that courts possess inherent authority to sanction "where that party's conduct thwarts the administration of justice, disobeys court orders, abuses the judicial process, or when it is otherwise necessary for the administration of justice and protection of judicial powers and processes." *Id.*, citing *Telecom Ltd. v. Wisehart & Wisehart, Inc.*, 2012-Ohio-4376, ¶ 15 (10th Dist.); and *Ceol v. Zion Indus., Inc.*, 81 Ohio App.3d 286, 289 (9th Dist. 1992).

{¶50}  Most recently, in *Gamble v. Gamble*, 2025-Ohio-2381, ¶ 26-27 (12th Dist.), the Twelfth District Court of Appeals exercised its inherent authority to impose sanctions against a party who submitted a brief exhibiting the hallmarks of AI-generated content, including nonexistent cases and miscited authorities. In doing so, the court cited the growing body of federal authority addressing AI-related misconduct, including *Gonzalez v. Texas Taxpayers & Research Assoc.*, 2025 U.S. Dist. LEXIS 16801 (W.D.Tex. Jan. 29, 2025); and *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Ents., LLC*, 2025 WL 1440351 (S.D.Fla. May 20, 2025). *Gamble* confirms that Ohio appellate courts

---

1. Although we are an appellate court, we, in effect, sit as a trial court in this matter. While the matter is "sui generis," without the authority to preside over collateral misconduct/sanction proceedings, the concept of appellate misconduct has no meaning.

Case No. 2024-A-0040

possess the same inherent authority exercised by trial courts across the country to sanction AI-related misconduct.

### C. Ohio Rules of Appellate Procedure

{¶51} App.R. 23 authorizes courts of appeals to award damages, including reasonable attorney fees, when an appeal is determined to be frivolous. While the instant proceeding is a post-appeal application to reopen rather than an appeal itself, the principle underlying App.R. 23—that appellate courts possess authority to sanction frivolous filings—is informative.

### D. Ohio Rules of Professional Conduct

{¶52} The Ohio Rules of Professional Conduct, while enforced through disciplinary proceedings administered by the Supreme Court of Ohio, also inform the standards of conduct expected of attorneys practicing before this court. Violations of these rules are relevant to the court's determination of whether misconduct occurred and to the gravity of such misconduct. As discussed below, respondent's conduct implicates multiple provisions of the Ohio Rules of Professional Conduct.

### E. Why Inherent Authority Is Necessary and Appropriate in This Case

{¶53} This court invokes its inherent authority because no single existing rule or statute adequately addresses the full scope of respondent's misconduct. Ohio Civ.R. 11, which requires attorneys to certify that filings are well-grounded in fact and warranted by existing law, does not by its terms apply in appellate proceedings. App.R. 23 is limited to frivolous appeals. R.C. 2323.51 addresses frivolous conduct but may not encompass every dimension of the misconduct here. The inherent authority of the court fills these

gaps and provides the necessary foundation for a comprehensive response to conduct that strikes at the very heart of the judicial process.

{¶54}  As the Supreme Court recognized in *Chambers*, the inherent power is "'particularly appropriate when the offending parties have practiced a fraud upon the court.'" 501 U.S. at 44, quoting *NASCO, Inc.*, 124 F.R.D. at 139. The submission of fabricated transcript quotations to an appellate court is precisely such conduct. It is not merely negligent; it is an assault on the integrity of the appellate process, which depends entirely upon the fidelity of the record and the candor of counsel.

## II. THE VIOLATIONS

{¶55}  This court finds, based upon respondent's admissions and the record before this court, that respondent's conduct constitutes the following violations:

### A. Prof.Cond.R. 3.3(a)(1): Candor Toward the Tribunal – False Statements of Fact

{¶56}  Prof.Cond.R. 3.3(a)(1) provides that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. . . ." Respondent submitted an application to reopen containing fabricated quotations attributed to the prosecutor—statements that never occurred during closing argument or at any point in the trial proceedings. These quotations were presented to this court as verbatim excerpts from the trial transcript. They were not verifiable, and respondent admitted they were hallucinations. They were the fabricated output of a generative AI tool.

{¶57}  While respondent contends he did not knowingly submit false statements, the rule also imposes a duty to correct. After movant identified the fabrications in its motion for sanctions, respondent neither withdrew the application nor filed an amended

version correcting the false statements. The failure to correct, after being put on notice of the materiality and falsity, is itself a violation of Prof.Cond.R. 3.3(a)(1). Moreover, respondent's subsequent appeal of this court's denial to the Supreme Court of Ohio—without disclosing the fabricated nature of certain material aspects of the underlying filing—compounded the violation by perpetuating the uncorrected false statements before a higher tribunal. The distinction respondent draws between knowing falsity and negligent failure to verify is not persuasive. Prof.Cond.R. 3.3(a)(1) imposes not only a prohibition on knowingly making false statements but also an affirmative duty to correct false statements previously made to the tribunal. Once movant identified the fabricated quotations in its reply brief and motion for sanctions, respondent was on actual notice that his filing contained false statements of material fact. At that point, the duty to correct attached irrespective of respondent's state of mind at the time of the original filing. Respondent cannot reasonably contend that movant's identification of the fabrications relieved him of his own independent obligation to correct the record. The duty to correct is personal to the attorney who made the false statement; it cannot be discharged vicariously through an adversary's filing.

## B. Prof.Cond.R. 3.3(a)(3): Offering False Evidence

{¶58} Prof.Cond.R. 3.3(a)(3) prohibits a lawyer from offering evidence the lawyer knows to be false. The fabricated transcript quotations were offered as evidence of ineffective assistance of appellate counsel and prosecutorial misconduct. They purported to be direct quotations from the record of proceedings. They were, in substance and effect, fabricated evidence. Movant aptly characterized the conduct as "the equivalent of fabricated evidence being provided to this Court, quotes that were not in the record, that

claim to have been in the record." T.p. 4. Even assuming respondent did not know the quotations were false at the time of filing, his continued failure to withdraw or correct the false evidence after learning of its falsity satisfies the rule's requirements. An attorney who learns that evidence he has offered to a tribunal is false has a duty to take reasonable remedial measures, including disclosure to the tribunal. Prof.Cond.R. 3.3(a)(3) must be read in conjunction with the remedial obligations imposed by the rule as a whole. Respondent's post-notice inaction converted what might have been an innocent initial submission into a sustained offering of evidence he knew, or by then had every reason to know, was false.

## C. Prof.Cond.R. 1.1: Competence

{¶59} Prof.Cond.R. 1.1 requires a lawyer to "provide competent representation to a client," which requires "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Competence in the modern legal landscape requires an attorney to understand the tools he or she employs in the practice of law, including artificial intelligence tools. An attorney who uses AI in the preparation of legal filings must understand the technology sufficiently to recognize its limitations, including the well-documented tendency of generative AI platforms to produce hallucinated content.

{¶60} Respondent's counsel conceded that respondent understood the distinction between public and proprietary AI tools and was on the "forefront of technology in this area." T.p. 10. Yet respondent failed to verify the AI-generated content against the actual trial transcript—a fundamental act of professional diligence to which respondent's counsel admitted. Counsel's candid concession that respondent "personally check[s] each and every quote to the transcript and each and every quote to the case law" in current practice

Case No. 2024-A-0040

(T.p. 17) constitutes a tacit acknowledgment that he was not performing this basic verification prior to the misconduct in this case. Competence under Prof.Cond.R. 1.1 is not measured solely by an attorney's general track record; it requires the knowledge, skill, thoroughness, and preparation reasonably necessary for each particular representation. The filing at issue was not a minor oversight in a routine matter. By his own admission, via counsel, respondent "screwed up." It was an application to reopen a final appellate judgment in a criminal case—a proceeding with significant consequences for the appellant and the integrity of the appellate process. An attorney who delegates the preparation of such a filing to a non-attorney, permits the use of a tool known to fabricate content, and then fails to verify the output against the actual record has not provided the thoroughness and preparation that is demanded under the law and rules of professional conduct. That respondent now verifies each quotation personally is a welcome reform, but it is also an admission that his prior practice fell below the standard of competence required under the rules of professional conduct.

## D. Prof.Cond.R. 5.3: Responsibilities Regarding Nonlawyer Assistance

{¶61} Prof.Cond.R. 5.3 requires a lawyer who has direct supervisory authority over a nonlawyer to "make reasonable efforts to ensure that the [nonlawyer's] conduct is compatible with the professional obligations of the lawyer. . . ." Respondent admitted that a non-attorney paralegal prepared the application to reopen. Respondent admitted that the paralegal uploaded case materials to ChatGPT, a public generative AI tool, in contravention of respondent's own stated policy. Respondent's failure to adequately supervise the paralegal's work product and to verify the accuracy of the filing before submission constitutes a failure to fulfill his supervisory responsibilities under

Case No. 2024-A-0040

Prof.Cond.R. 5.3. That rule provides guidance for "responsibilities regarding nonlawyer assistants."

{¶62} The delegation of the preparation of an appellate filing to a paralegal, without meaningful review, raises additional concerns under the foregoing rule. The preparation of an application to reopen a criminal appeal requires legal analysis, knowledge of appellate standards, familiarity with the trial record, and the exercise of legal judgment. While paralegals may assist attorneys in the preparation of filings, the substantive legal work and the ultimate responsibility for the accuracy and propriety of the filing remain with the attorney. An attorney's obligation under Prof.Cond.R. 5.3 cannot be satisfied by a general directive not to use certain AI tools; it requires active supervision and meaningful review of work product. The existence of a policy, standing alone, does not satisfy the supervisory obligation imposed by Prof.Cond.R. 5.3. The rule requires reasonable efforts to ensure that the nonlawyer's conduct is compatible with the lawyer's professional obligations. A policy that is neither monitored nor enforced is no policy at all. Moreover, respondent's obligation was not limited to issuing directives; it extended to reviewing the work product generated under his supervision before filing it with a court. This court does not require attorneys to redo all delegated work, but it does require them to review filings that bear the attorneys' signatures and are submitted to a court under penalty of perjury—particularly filings that attribute specific quotations to identifiable individuals. The standard is *meaningful* review, not blind ratification.

## E. Prof.Cond.R. 8.4(c): Dishonesty, Fraud, Deceit, or Misrepresentation

{¶63} Prof.Cond.R. 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. . . ." The

submission of fabricated transcript quotations to this court constitutes misrepresentation, regardless of whether respondent personally authored the false statements or was aware of their falsity at the time of filing. An attorney who signs and files a document containing fabricated content has made a representation to the court that the content is accurate and reliable. Respondent's signature on the application and accompanying affidavit was his personal assurance to this court that the statements contained therein were truthful. They were not. This court does not hold that negligent failure to verify, standing alone, constitutes dishonesty or fraud. However, the analysis does not end with the initial filing. When respondent was put on notice that the filing contained fabricated quotations and thereafter took no corrective action—and indeed pursued an appeal of the denial to the Supreme Court of Ohio without disclosing the infirmity—the conduct moved beyond mere negligence. An attorney who knows a representation to the court is false and allows it to stand has made that false representation on his or her own. The misrepresentation is not the initial filing in isolation; it is the continued assertion of the filing's validity through silence and affirmative reliance upon it in subsequent proceedings.

## F. Prof.Cond.R. 8.4(d): Conduct Prejudicial to the Administration of Justice

{¶64} Prof.Cond.R. 8.4(d) prohibits a lawyer from engaging "in conduct that is prejudicial to the administration of justice. . . ." Respondent's misconduct prejudiced the administration of justice in multiple respects. First, it required the movant to expend time and resources identifying and responding to fabricated allegations—time and resources that the Ashtabula County Prosecutor's Office, as a publicly funded entity, could ill afford. Second, it required this court to devote substantial judicial resources to investigating the matter, conducting a hearing, ordering briefing, and adjudicating the sanctions

proceeding—resources that would otherwise have been directed to the legitimate business of this court. Third, and most fundamentally, the submission of fabricated evidence to a court of law undermines public confidence in the integrity of the judicial system.

{¶65} As the movant's counsel observed at the hearing, had the fabricated quotations not been detected, the result could have been "massively prejudicial to the administration" of justice. T.p. 22. While this court confirms, dis-confirms, and cross-references all cited sources, the movant's statements are still of significant import. The integrity of the appellate process depends upon the accuracy of the record and the candor of counsel. When either is compromised, the entire system is diminished. That the fabrications were detected does not diminish the prejudice to the administration of justice; it merely means the worst consequences were averted. The detection required the expenditure of significant resources by movant—32.1 documented hours of staff time—and by this court. The argument that the system "worked as intended" proves too much and only serves to further implicate respondent in misconduct. Neither this court nor movant should serve as a vetting body for another's lack of diligence. If we were to follow such logic, no fraud upon the court could ever be sanctioned so long as the fraud was ultimately discovered. The harm to the administration of justice is not limited to the outcome of the underlying application; it includes the diversion of judicial and prosecutorial resources, the reputational harm to the individuals falsely accused, and the erosion of the court's ability to rely upon the representations of counsel. These harms materialized regardless of the application's ultimate disposition.

## G. Failure to Take Corrective Action

Case No. 2024-A-0040

{¶66} Separate and apart from the initial filing of the application containing fabricated quotations, this court finds that respondent's failure to take corrective action after being notified of the errors constitutes an independent ground for sanctions. Respondent never withdrew or amended the application containing the false quotations— not after movant identified the fabrications, not after the show cause order, not after the hearing, and not at any point during the pendency of these proceedings. Courts across the country that have addressed AI-related misconduct have consistently recognized that voluntary correction is the single strongest mitigating factor in sanctions analysis. *See, e.g.*, *Mata v. Avianca, Inc.*, 678 F.Supp.3d 443, 461 (S.D.N.Y. 2023) (imposing heightened sanctions where attorneys doubled down on fabricated citations rather than immediately correcting the record). The absence of voluntary correction here aggravates the misconduct. The duty to correct a false statement to a tribunal is not excused by the adversary's identification of the falsehood. The obligation is personal and independent. The court was aware of the fabrications through the motion for sanctions and its own confirmation. This does not relieve respondent of his duty to withdraw, amend, or otherwise correct the filing. An attorney who leaves a fabricated filing in the record of a court, uncorrected and unamended, has made a continuing representation that the filing is legitimate. The argument that withdrawal would have been "redundant" conflates and disregards an attorney's duty and discounts the court's awareness of the problem. These are distinct matters. Moreover, when respondent appealed to the Supreme Court of Ohio without correcting the record, the argument that correction was unnecessary because the issue was already before this court loses whatever force it might otherwise have had. Respondent was aware of the misstatements and proceeded without correction.

Case No. 2024-A-0040

## H. Recurrence of AI-Related Errors: The *Saker* Filing

{¶67} While this court recognizes respondent's contention that the *Saker* matter is beyond this court's jurisdiction, the *Saker* filing is relevant to the sanctions determination in this case for two reasons. First, it bears directly on the sincerity and effectiveness of respondent's self-imposed remedial measures. An attorney who represents to the court that he has implemented new policies and procedures to prevent AI-related errors, and then files a document in another court two months later containing a ChatGPT prompt embedded in the text of a legal filing, has demonstrated that his remedial measures are ineffective. Second, the *Saker* filing is relevant to this court's assessment of whether additional, court-imposed safeguards are necessary to protect the judicial system from future harm.

{¶68} This court does not adjudicate respondent's conduct in the *Saker* matter, and respondent's rights in that proceeding are unaffected by this order. However, the relevance of the *Saker* filing to the sanctions determination in this case is straightforward: respondent represented to this court that he had implemented remedial measures to prevent the recurrence of AI-related errors. The *Saker* filing, which respondent himself acknowledged, is probative of whether those representations were accurate and whether the self-imposed measures were effective. A court is entitled to consider the credibility and effectiveness of an attorney's professed remedial measures when determining the appropriate scope of sanctions. This is not an adjudication of the Cuyahoga County matter; it is an assessment of respondent's credibility and the adequacy of his corrective actions in this case, and consideration of the *Saker* filing as evidence of a continuing

pattern relevant to the nature and scope of sanctions warranted here. Respondent was afforded the opportunity to brief this issue and did so; due process does not require more.

## III. THE COURT'S INDEPENDENT OBLIGATION TO ACT

### A. The Court Is Not Bound by a Private Settlement Agreement

{¶69}  The parties' settlement agreement resolves the movant's claim for attorney fees. It does not, and cannot, resolve the court's independent interest in maintaining the integrity of the proceedings before it. A court's authority to sanction misconduct is not merely a remedy available to aggrieved parties; it is an exercise of the court's inherent power to protect the judicial process itself. The interests at stake transcend the interests of the litigants. Private parties cannot, by agreement, divest a court of its obligation to address conduct that undermines the administration of justice. *See Great Am. Life Ins. Co.*, 2015 WL 13928758, at *2 (an appellate court possesses inherent powers derived not from rules or statutes to impose proper sanctions for conduct abusing the judicial process).

{¶70} This principle is well established. In *Chambers*, the Supreme Court recognized that the inherent power to sanction includes the ability to act sua sponte—that is, on the court's own initiative—to address conduct that abuses the judicial process. 501 U.S. at 43-45. The withdrawal of movant's sanctions motion does not extinguish this court's independent authority to act. The settlement agreement resolved movant's particularized claim for attorney fees. It did not, and could not, address the court's independent institutional interests. Settlements are designed to achieve finality between the parties to the agreement; they do not bind non-parties, and the court is not a party to the settlement. Nor does the referral to the Office of Disciplinary Counsel render this

court's sanctions redundant. The disciplinary process may take months or years to conclude, and its outcome is uncertain. If courts routinely deferred to the disciplinary process whenever misconduct implicated the Rules of Professional Conduct, the court before which the fraud was perpetrated—the institution most immediately harmed—would be left without a timely remedy. The sanctions imposed here address the immediate harm to these proceedings; the disciplinary referral addresses respondent's broader fitness to practice. *See, e.g., Warren Cty. Bar Assn. v. Marshall*, 2009-Ohio-501, ¶ 19 ("[t]he primary purpose of the disciplinary process is to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship and to allow us to ascertain the lawyer's fitness to practice law"). These are distinct functions requiring distinct action.

## B. The Court Must Not Defer Solely to the Disciplinary Process

{¶71}  Respondent suggests, implicitly if not explicitly, that professional discipline is more appropriately administered through the Supreme Court of Ohio's disciplinary process. While this court recognizes the vital role of the disciplinary system and, as discussed below, refers respondent's conduct to the Office of Disciplinary Counsel for investigation, deference to the disciplinary process does not relieve this court of its own responsibilities.

{¶72}  The disciplinary process and the court's sanctioning authority serve distinct functions. The disciplinary process addresses an attorney's fitness to practice law. The court's sanctioning authority protects the integrity of the proceedings before it, compensates parties harmed by misconduct, deters future misconduct, and vindicates the court's authority. These functions are complementary, not mutually exclusive.

Case No. 2024-A-0040

{¶73} If courts were to defer routinely to the disciplinary process whenever attorney misconduct implicated the Rules of Professional Conduct, the practical result would be to leave the immediate harm unaddressed. Disciplinary proceedings are, by design, deliberative processes that may take months or years to resolve. Meanwhile, the court before which the misconduct occurred—the court that was directly deceived—would remain powerless to address the harm. This court will not abdicate its responsibility to safeguard the integrity of its own proceedings.

{¶74} The disciplinary process, however vital, cannot perform the functions that only this court can perform. The Office of Disciplinary Counsel cannot vindicate the authority of this court. It cannot restore the integrity of this court's record. It cannot remedy the reputational harm inflicted upon the trial prosecutor, the defense attorney at trial, the trial judge, and prior appellate counsel by fabricated allegations filed in this court's proceedings. It cannot deter future misconduct before this court, especially where this court has the authority to act where its processes are abused. It cannot ensure that filings submitted to this court are accurate and reliable. These are obligations that belong to this court alone, arising from its constitutional role as a court of record vested with the judicial power of this state. If this court does not act to protect the integrity of its own proceedings, no other court, agency, or authority can do so in its stead. The question is not whether the disciplinary system exists-it does, and this court invokes it. The question is whether this court will fulfill its own independent obligation to safeguard the judicial process. Abdication of that obligation, in deference to a process that serves a different purpose, would itself be a failure of judicial duty and function to silently ratify misconduct that cannot be effectively addressed via the disciplinary process alone.

{¶75} Moreover, courts that have addressed AI-related misconduct have consistently exercised their sanctioning authority directly, imposing monetary sanctions, requiring corrective measures, striking filings, and referring the matter for disciplinary investigation. *See, e.g.*, *Mata*, 678 F.Supp.3d 443; *Wadsworth v. Walmart, Inc.*, 348 F.R.D. 489 (D.Wyo. 2025); *United States v. Hayes*, 763 F.Supp.3d 1054 (E.D.Cal. 2025); *In re Baby Boy*, 271 N.E.3d 524 (Ill.App. 2025). These courts did not abdicate their authority to the disciplinary system. Neither shall this court.

## C. The Emerging Crisis of AI Misconduct Demands Judicial Engagement

{¶76} This court writes at an inflection point in the legal profession. The rapid proliferation of generative artificial intelligence tools has created a crisis of integrity in the courts. Across the country, courts at every level—federal and state, trial and appellate— have confronted cases involving the submission of AI-generated fabricated legal authorities and evidence. These cases have arisen with alarming frequency and show no signs of abating.

{¶77} The phenomenon is not merely a technological curiosity. It strikes at the foundation of the adversarial system, which depends upon the assumption that the legal authorities and evidence cited by counsel are real and the factual representations made to the court are accurate. When that assumption is violated—whether through intentional fabrication or reckless reliance on AI-generated content—the entire system is compromised.

{¶78} Courts that fail to respond to AI misconduct with appropriate sanctions send a dangerous message: that the submission of fabricated content carries no meaningful consequences. This court will not contribute to that message. The sanctions imposed

herein are intended not only to address the specific misconduct in this case, but to serve as a clear signal to members of the bar that AI-related misconduct will be taken seriously by this court and, this court hopes, by courts throughout the State of Ohio.

## IV. GOOD FAITH OR BAD FAITH

{¶79}  Under *Chambers*, 501 U.S. 32, and its progeny, the imposition of sanctions under a court's inherent authority requires, at minimum, a finding of bad faith, vexatious conduct, or willful abuse of the judicial process. *Roadway Express*, 447 U.S. at 766.

{¶80}  Respondent contends he acted in good faith—that his failure to detect the fabricated quotations was an honest mistake, albeit a serious one. This court has considered respondent's argument carefully and determines that the totality of the circumstances demonstrates, at minimum, a reckless disregard for the truth amounting to bad faith.

{¶81}  Several factors support this conclusion. First, respondent was not ignorant of AI's limitations. His own counsel conceded at the hearing that respondent was sophisticated in his understanding of AI tools. An attorney who understands the risks of AI hallucination and nonetheless permits unverified AI-generated content to be filed in an appellate court acts with a degree of recklessness that transcends mere negligence.

{¶82}  Second, the nature of the fabricated content is significant. The application did not merely cite a questionable legal proposition or misstate a procedural standard. It attributed specific, inflammatory statements to a real person—the trial prosecutor—that that person never made. This is not the kind of error that results from good-faith carelessness; it is the kind of error that results from a failure to perform the most basic verification of the assertions being made to the court.

{¶83}   Third, respondent's failure to take corrective action after being put on notice of the fabrications further undercuts any claim of good faith. A good-faith actor, upon learning that a filing contains fabricated quotations, would immediately move to withdraw the application or amend the filing. Respondent did neither. He did not withdraw the application. He did not file an amended version. He did not notify this court that the filing was infirm. Instead, he allowed the fabricated filing to remain in the record of this court without correction.

{¶84}   Fourth, respondent's conduct before the Supreme Court of Ohio is among the most telling indicators of bad faith. After this court denied the application to reopen—an application respondent knew or should have known was predicated on AI-generated fabrications—respondent appealed the denial to the Supreme Court. In doing so, respondent did not withdraw the fabricated filing, did not amend the false representations, and did not inform the Supreme Court that the application, the denial of which he was challenging, had been, in significant part, built upon hallucinated transcript quotations. This was not the conduct of an attorney who had made an innocent mistake and was eager to correct the record. This was the conduct of an attorney who, having been caught submitting fabricated evidence to one court, sought to leverage the same fabricated filing before a higher court without disclosure. The doubling down on a filing known to contain false representations is fundamentally inconsistent with good faith.

{¶85}   Fifth, the subsequent *Saker* filing demonstrates that respondent's professed commitment to preventing future AI errors was not matched by his actual practice. The inclusion of a ChatGPT prompt in a court filing—two months after a sanctions hearing in

this court addressing the very same conduct—suggests that respondent has not internalized the gravity of his obligations.

{¶86} The AI policy submitted to this court bore the hallmarks of AI generation, complete with unfilled bracketed placeholders where the attorney's own firm-specific information should have appeared. An attorney who submits an AI-generated AI policy as evidence of his commitment to responsible AI use—without even completing the template's placeholder fields—has not demonstrated a genuine commitment to reform.

{¶87} This court therefore finds that respondent's conduct is contemptuous and committed in violation of Civ.R. 11 and was committed willfully or with reckless disregard for his professional obligations, constituting bad faith sufficient to warrant sanctions under the court's inherent and contempt authority, as well as Civ.R. 11.

## V. SANCTIONS

{¶88} In fashioning sanctions, this court is guided by the principle that sanctions must be proportionate to the misconduct, tailored to address the specific harms caused, and designed to serve the purposes for which the court's sanctioning authority exists: to compensate for harm, to deter future misconduct, to punish bad faith conduct, to protect the integrity of the judicial process, and to preserve public confidence in the administration of justice. The court also considers respondent's admissions, his expressions of remorse, and the mitigating factors he has raised. Each sanction imposed serves a distinct purpose and addresses a distinct dimension of respondent's misconduct. The monetary sanction is compensatory. The referral to the Office of Disciplinary Counsel fulfills this court's mandatory reporting obligation. The notification requirement ensures that courts before which respondent appears can exercise informed oversight. The certification requirement

formalizes duties that every attorney already bears. The CLE requirement addresses the knowledge deficiencies that gave rise to the misconduct. The striking of the application protects the integrity of the court's records. The removal of counsel protects Mr. Coleman's right to effective representation. The apology letters address the reputational harm to individuals falsely accused. No single sanction, standing alone, would adequately address the full scope of the misconduct. The certification and notification requirements impose no burden beyond transparency—a burden that is a direct and proportionate consequence of respondent's demonstrated inability to ensure the accuracy of his filings without external accountability.

{¶89}  This court imposes the following sanctions:

**A. Monetary Sanction: $2,000 Fine, With Credit for $2,000 Already Paid**

{¶90}  Respondent shall pay a monetary sanction in the amount of $2,000. Respondent shall receive credit for the $2,000 payment already made to the Ashtabula County Prosecutor's Office pursuant to the parties' settlement agreement.

{¶91}  While the settlement payment satisfies the monetary component of this sanction, this court emphasizes that the payment is credited against the court's independently imposed sanction—it does not serve as a substitute for it. The court's authority to levy a monetary sanction exists independent of, and is not extinguished by, the parties' private agreement. This court imposes the sanction to establish, as a matter of precedent, that courts possess and will exercise the inherent authority to impose monetary sanctions for AI-related misconduct that constitutes bad faith abuse of the judicial process. The amount imposed is compensatory in nature, well within the range of documented costs incurred by  movant and this court in addressing respondent's

misconduct—movant alone documented 32.1 hours of staff time devoted to the matter—and is proportionate to the sanctions imposed by courts across the country in comparable AI-related cases. *See, e.g., Wadsworth*, 348 F.R.D. at 499 ($3,000 and $1,000 fines); *Mata*, 678 F.Supp.3d at 466 ($5,000 penalty jointly and severally imposed); *Mid Central Operating Engineers Health & Welfare Fund v. HoosierVac*, 2025 WL 574234 (S.D.Ind. 2025) ($15,000 sanction). That respondent owes no additional payment as a practical matter does not diminish the significance of this court's exercise of its sanctioning authority.

{¶92} This court recognizes that *Haeger*, 581 U.S. at 107-108, counsels that inherent-authority sanctions should be compensatory rather than punitive. The $2,000 amount is well within the range of documented costs incurred by movant and this court in addressing respondent's misconduct and is therefore compensatory in nature.

## B. Referral to the Office of Disciplinary Counsel

{¶93} This court refers respondent's conduct to the Office of Disciplinary Counsel of the Supreme Court of Ohio (ODC) for investigation. In fact, informing ODC is mandatory. Prof.Cond.R. 8.3(a) ("[a] lawyer who possesses unprivileged knowledge of a violation of the Ohio Rules of Professional Conduct that raises a question as to any lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform a disciplinary authority empowered to investigate or act upon such a violation"). The conduct described in this judgment entry implicates multiple provisions of the Ohio Rules of Professional Conduct, including Prof.Cond.R. 1.1 (competence), Prof.Cond.R. 3.3(a)(1) and (a)(3) (candor toward the tribunal), Prof.Cond.R. 5.3 (responsibilities regarding nonlawyer assistance), Prof.Cond.R. 8.4(c) (dishonesty, fraud, deceit, or

misrepresentation), and Prof.Cond.R. 8.4(d) (conduct prejudicial to the administration of justice).

{¶94} As discussed above, this court's imposition of sanctions and the disciplinary process serve complementary functions. They serve different purposes and have different burdens of proof (for the disciplinary process: clear and convincing evidence). The disciplinary system is uniquely positioned to assess respondent's fitness to practice law, to investigate whether this conduct is part of a broader pattern, and to impose the full range of disciplinary measures available under the Supreme Court Rules for the Government of the Bar of Ohio. This referral is not a disposition on the merits; it is a notification to the appropriate authority that conduct warranting investigation has been identified by a court before which the respondent practiced.

{¶95} The administrator of this court shall send a copy of this judgment entry, with a notation of referral, to the Office of Disciplinary Counsel via electronic mail upon its filing.

## C. Service Upon Courts and Judges for Two Years

{¶96} For a period of two years from the date of this judgment entry, respondent shall serve a copy of this judgment entry upon the presiding judge or administrative judge of every court in which respondent files a new appearance, enters a new case, or otherwise undertakes representation. Such service shall be made within 14 days of respondent's first filing in each such court. Respondent shall file proof of such service with this court within seven days of serving each judge.

{¶97} This sanction serves multiple purposes. First, it ensures that courts before which respondent practices are informed of his prior misconduct and can exercise

appropriate vigilance in reviewing his filings. Second, it serves a continuing deterrent function, requiring respondent to confront the consequences of his misconduct each time he enters a new case. Third, it protects the administration of justice by placing courts on notice of the potential for AI-related errors in respondent's filings. Courts that have addressed comparable AI misconduct have imposed similar notification requirements. *See, e.g.*, *Mata*, 678 F.Supp.3d at 466 (requiring attorneys to send copies of the sanctions order to judges falsely identified in fabricated citations); *Hayes*, 763 F.Supp.3d at 1073 (ordering copies of order to all district and magistrate judges).

## D. Certification and Verification Requirements for Future Filings

{¶98}    For a period of two years from the date of this judgment entry, every filing submitted by respondent to any Ohio court shall include a signed certification that:

> (a) all citations to legal authority contained in the filing have been independently verified by the attorney of record as being real, accurately quoted, and still valid;

> (b) all quotations attributed to any person, transcript, or document have been verified against the original source by the attorney of record;

> (c) all factual representations contained in the filing have been verified by the attorney of record as having evidentiary support in the record or other reliable source;

> (d) to the extent any portion of the filing was drafted with the assistance of a generative artificial intelligence tool, the attorney of record has disclosed the use of such tool and has independently verified all AI-generated content; and

> (e) the attorney of record has personally reviewed the entire filing for accuracy, completeness, and compliance with all applicable rules.

{¶99}    This certification requirement is a prophylactic measure designed to prevent the recurrence of the very conduct at issue in this case. It imposes no burden beyond

Case No. 2024-A-0040

what every attorney should already be doing as a matter of professional obligation. The requirement merely formalizes and makes explicit the duty that respondent admittedly failed to fulfill.

**E. Mandatory Continuing Legal Education**

{¶100} Within 150 days of the filing of this judgment entry, respondent shall complete no fewer than six hours of continuing legal education ("CLE") specifically focused on the following topics: (a) the ethical use of artificial intelligence in the practice of law; (b) the professional responsibility implications of AI-generated content; (c) attorney supervision of nonlawyer assistants in the context of AI tools; and (d) candor toward the tribunal and the duty to verify filings. These CLE hours shall be in addition to, and not counted toward, respondent's regular biennial CLE requirements.

{¶101} Respondent shall file proof of completion with this court within seven days of completing the required CLE. Respondent's counsel indicated at the August 28, 2025 hearing that respondent had voluntarily completed some CLE courses related to AI. While this court acknowledges and credits respondent's voluntary efforts, the CLE required by this order is a separate, mandatory obligation that must be fulfilled in its entirety.

{¶102} Courts across the country have recognized the value of mandatory CLE as a component of AI-related sanctions. *See, e.g.*, *In re Rodney Richburg*, 671 B.R. 918, 926 (Bankr.D.S.C. 2025) (ordering three hours of CLE on AI ethics). The educational component of sanctions serves the dual purpose of remediation—ensuring that the sanctioned attorney possesses the knowledge necessary to use AI responsibly—and deterrence—signaling to the profession that courts take AI competence seriously.

**F. Striking of the Application to Reopen**

Case No. 2024-A-0040

{¶103} The application to reopen filed by respondent on May 19, 2025, is hereby stricken from the record of this court. The filing contains fabricated quotations that constitute false representations to this court. It should not remain in the record as though it were a legitimate legal filing. While this court has already denied the application on the merits, the striking of the filing serves the additional purpose of ensuring that the fabricated content is formally repudiated and does not remain as part of the permanent record of this case without notation of its infirmity.

{¶104} Striking filings that contain AI-generated fabrications is a recognized sanction in AI-related misconduct cases. *See, e.g.*, *In re Will of Samuel*, 82 Misc.3d 616, 626 (N.Y.Surr. 2024) (striking pleading containing AI-generated fabricated cases); *Powhatan County School Board v. Skinger*, 2025 WL 1559593, *11 (E.D.Va. June 2, 2025) (striking filings under the court's inherent authority). The integrity of the court's records demands that filings containing known fabrications be treated accordingly.

## G. Removal of Respondent as Counsel for Malikhi Jermaine Coleman

{¶105} Respondent is hereby removed as counsel for Malikhi Jermaine Coleman in this case and in any related proceedings. Respondent shall take no further action on behalf of Mr. Coleman in this court.

{¶106} This sanction is warranted for several reasons. First, respondent's misconduct was committed in the course of his representation of Mr. Coleman. The filing that formed the basis of this sanctions proceeding was submitted on Mr. Coleman's behalf, and the fabricated quotations were used to support allegations of prosecutorial misconduct in Mr. Coleman's criminal case. Mr. Coleman is the direct victim of respondent's incompetence: his application to reopen was denied because the

allegations of prosecutorial misconduct, which formed a significant basis of the application, were premised on fabricated evidence. A defendant's right to counsel of choice, while significant, is not absolute, more so, in the case of counsel selected or appointed by the court for the benefit of the defendant and paid at public expense. It must yield when the attorney's continued representation would undermine the integrity of the proceedings or create a conflict between the attorney's interests and the client's interests. Here, respondent's misconduct was committed in the course of Mr. Coleman's representation, and respondent has been sanctioned for that very misconduct. Respondent now faces potential disciplinary proceedings arising from his conduct in Mr. Coleman's case. The resulting conflict between respondent's personal interest in minimizing the consequences of his own misconduct and Mr. Coleman's interest in vigorous, unconflicted representation is apparent. This court's concern is not hypothetical: Mr. Coleman's application to reopen was denied because its substantive core was fabricated. Mr. Coleman was the person most directly harmed by respondent's incompetence. Continuity of counsel cannot outweigh the right to counsel unburdened by the consequences of prior misconduct in the very same proceeding.

{¶107} Second, the continued representation of Mr. Coleman by an attorney who has been sanctioned for misconduct committed in the very case in which he serves as counsel presents an irreconcilable conflict. Mr. Coleman is entitled to effective legal representation, and this court cannot have confidence that respondent will provide such representation given the circumstances. The integrity of Mr. Coleman's legal interests requires that he be represented by counsel who has not been sanctioned for misconduct in this very proceeding.

Case No. 2024-A-0040

{¶108} Third, the removal of counsel in the context of AI-related misconduct is consistent with the approach taken by other courts. *See, e.g.*, *Mavy v. Commr. of Social Sec.*, 2025 WL 2355222, *10 (D.Ariz. Aug. 14, 2025), *opinion vacated in part on reconsideration*, 2026 WL 91483 (D.Ariz. Jan. 13, 2026) (revoking pro hac vice status on a specific case for AI-related misconduct); *Wadsworth*, 348 F.R.D. at 499 (revoking pro hac vice admission after multiple fabricated AI citations). While this court's removal of respondent as counsel is more limited in scope than revocation of bar admission, it is an appropriate and proportionate response to the misconduct committed in this specific case.

{¶109} Nothing in this order prevents Mr. Coleman from retaining new counsel or from pursuing any remedies to which he may be entitled, including but not limited to a new application to reopen supported by legitimate, verified legal authority. The new application to reopen shall be filed within 90 days of the filing of this judgment entry.

{¶110} Respondent shall, within 14 days of the filing of this judgment entry, serve a copy of this order upon Mr. Coleman, together with a written explanation, in plain and understandable language, of the nature of respondent's misconduct and the reasons respondent has been removed as Mr. Coleman's counsel. Respondent shall inform Mr. Coleman that he has the right to retain new counsel or to proceed pro se and shall provide Mr. Coleman with the contact information for the Ohio Public Defender's Office and the Ashtabula County Public Defender's Office. Respondent shall file proof of such service and communication with this court within seven days of effectuating the same.

## H. Written Apologies to Persons Defamed by the Fabricated Filing

{¶111} The fabricated quotations contained in the application to reopen were not abstract falsehoods. They attributed specific, inflammatory, and unprofessional

statements to a real prosecutor—the Ashtabula County trial prosecutor, Dawn Catalamessa, who conducted the closing argument in the underlying criminal case. Those fabricated statements, if credited, would have constituted evidence of serious professional misconduct by the prosecutor, potentially subjecting the prosecutor to disciplinary investigation, professional embarrassment, and reputational harm.

{¶112} The fabricated quotations also necessarily impugned the integrity of the trial judge, Judge Thomas E. Harris, who presided over Mr. Coleman's trial. By alleging that the prosecutor made inflammatory, improper statements during closing argument, the application implicitly accused the trial judge of permitting such statements without correction, sustaining objection, or curative instruction—a failure that, if it had occurred, would itself constitute reversible error and a breach of the judge's duty to ensure a fair trial.

{¶113} Additionally, the application's claim of ineffective assistance of appellate counsel necessarily impugned prior trial counsel, Malcolm Stewart Douglas, and appellate counsel, Russell Bensing, by accusing trial counsel of failing to object so as to protect the defendant, and appellate counsel of failing to raise what would have been— had the fabricated quotations been real—an obvious and meritorious claim of prosecutorial misconduct and ineffective assistance of defense counsel on direct appeal.

{¶114} Respondent shall, within 30 days of the filing of this judgment entry, deliver written letters of apology to each of the following persons:

> (a) the Ashtabula County trial prosecutor who conducted the closing argument in *State v. Coleman*, for the false attribution of inflammatory statements that the prosecutor never made;

Case No. 2024-A-0040

(b) the trial court judge who presided over *State v. Coleman*, for the implicit accusation that the judge permitted uncorrected prosecutorial misconduct; and

(c) the trial attorney and prior appellate counsel for Mr. Coleman on direct appeal, for the implicit accusations that they collectively failed to object to, and thereafter raise, a meritorious claim of prosecutorial misconduct.

{¶115} Each of the four letters shall acknowledge that the statements attributed to these individuals, or the professional failures attributed to these individuals, in the application to reopen were false, were generated by an artificial intelligence tool, and were filed without verification. Each letter shall be accompanied by a copy of this judgment entry. Respondent shall file copies of the letters and proof of delivery with this court within seven days of sending the letters.

{¶116} This sanction is not punitive in nature. It is restorative. The persons identified above were subjected to false allegations of professional misconduct through no fault of their own. They are owed an acknowledgment that the allegations were baseless. The integrity of the legal profession demands no less. The letters required by this order are not compelled expressions of personal contrition. They are corrective communications requiring respondent to acknowledge objective facts: that specific statements were falsely attributed to identifiable individuals, that those statements were generated by an artificial intelligence tool, and that they were filed without verification. Courts routinely require corrective disclosures as a remedial measure—including requirements to notify affected persons and tribunals of prior misrepresentations. Such requirements serve the legitimate interest of correcting the record and restoring the reputations of persons harmed by false statements submitted to a court. That the fabricated quotations were ultimately identified and not relied upon does not mean the

individuals to whom inflammatory misconduct was attributed suffered no harm. The public filing of an application accusing a prosecutor of making statements she never made, a judge of tolerating misconduct that never occurred, and an attorney of failing to object to or raise an issue that did not exist, inflicts reputational harm the moment it enters the public record—harm that persists until it is formally corrected.

## VI. COMPLIANCE AND ENFORCEMENT

{¶117} Respondent shall comply fully and timely with each sanction imposed by this order. This court retains jurisdiction to enforce this order and to address any failure to comply.

{¶118} Failure to comply with any provision of this order may result in contempt proceedings pursuant to R.C. 2705.02 and this court's inherent contempt authority. Contempt sanctions for noncompliance may include additional monetary fines, imprisonment, or both, as this court deems necessary to vindicate the authority of the court and to compel compliance.

{¶119} Respondent shall maintain a record of compliance with each provision of this order and shall, upon request by this court, produce such records for review.

## VII. POINTS ADDRESSING THE DISSENTS OBJECTIONS

### A. The Alleged "Adjudication of Professional Conduct Violations"

{¶120} The dissent characterizes the majority judgment as attempting to adjudicate alleged violations of the Rules of Professional Conduct. This is a Straw-Man argument. This judgment does not purport to discipline respondent under the Rules of Professional Conduct. It does not suspend his license, place him on probation under Gov.Bar R. V, or impose a sanction reserved solely to the Supreme Court of Ohio. This entry identifies

*standards of conduct* respondent violated and, with this in mind, this court utilizes its inherent authority to impose sanctions due to the admitted violations.

{¶121} Every court that exercises inherent sanctioning authority articulates the foundation of an attorney's wrongdoing in support of the sanctions. Identifying an attorney's misconduct and proceeding to sanctions is not tantamount to a disciplinary proceeding. Courts, vindicating the integrity of the judicial process, commonly exercise this authority via disqualification, fee-shifting, and show-cause/contempt orders. There is a distinction between *referencing* the Rules of Professional Conduct and *administering discipline* under those rules. This judgment does the former, only the Supreme Court of Ohio can do the latter. *See supra* ¶ 71-73.

## B. Ohio Cases Support this Court's Actions

{¶122} The dissent reads the case law cited by the majority too narrowly. The Supreme Court of Ohio's holdings are not so limited.

{¶123} In *Mentor Lagoons*, 31 Ohio St.3d 256, the Court held that a trial court has the "'inherent power to regulate the practice before it and protect the integrity of its proceedings,'" including the ""authority and duty to see to the ethical conduct of attorneys.""" *Id.* at 259, quoting *Royal Indemn. Co.*, 27 Ohio St.3d at 33-34, quoting *Hahn*, 95 Wash.2d at 34. The Court emphasized that "[t]his power is distinct from the exclusive authority of the Supreme Court of Ohio over attorney disciplinary proceedings, and does not conflict with such power." (Citation omitted.) *Mentor Lagoons* at 259-260. The dissent quotes this language but reads it as limiting a court's authority to disqualification. The Supreme Court, however, did not limit the authority to

Case No. 2024-A-0040

disqualification—it described the authority as a general power, the use of which for disqualification is merely one application.

{¶124} Similarly, in *Royal Indemn.*, the Court stated that "disciplinary proceedings, contempt sanctions[,] and court revocation of pro hac vice privileges are distinct, but not exclusive methods of addressing attorney misconduct," and "the appropriateness of one is not dependent on the availability of the another." *Id.* at 620. The dissent reads this as a mutually exclusive, closed list—three methods, no more. The Court's point, however, was the opposite: Multiple avenues for addressing misconduct coexist without eliminating one another. The same observations can be attributed to the dissenting opinion's characterization of the opinions in *DiCuccio*, 2018-Ohio-2320 (10th Dist.), and *Gamble*, 2025-Ohio-2381 (12th Dist.). *See supra* ¶ 48-50.

## C. The Gov.Bar R. V Exclusivity Argument Proves Too Much

{¶125} The dissent additionally asserts that Gov.Bar R. V is "the exclusive mechanism for disciplining attorneys in Ohio" and the majority's approach usurps that framework. But if the identification of professional-conduct violations in the course of a sanctioning proceeding constitutes an unauthorized exercise of disciplinary authority, then no Ohio court could articulate the basis for a contempt finding, a disqualification order, or a frivolous-conduct fee award in any case where the misconduct at issue also implicates the Rules of Professional Conduct. *See supra* at ¶ 44-46.

{¶126} Further, and significantly, the sanctions imposed in this matter are not disciplinary sanctions. The majority fully understands and appreciates that disciplinary sanctions, such as a license suspension or monitored probation, are within the Supreme

Court of Ohio's jurisdiction. This entry does not purport to trespass on those preserves. *See supra* at ¶ 52 and ¶ 75.

## D. The "Statewide Reach" Objection

{¶127} The dissent asserts that, somehow, the notification and certification requirements would "interfere with the legal authority of other Ohio courts." This entry does not direct other courts to act or refrain from acting in any way. Rather, it simply imposes obligations on respondent—an attorney who appeared before *this court* and admittedly committed misconduct during the course of *this court's* proceedings. The sanctions at issue are measures directed at respondent and do not impact the function or proceedings of other tribunals.

## E. The Due Process Objection

{¶128} The dissent also claims that the sanctions "deprive respondent of even a vestige of substantive or procedural due process." To the contrary, respondent was served with a show-cause order. *See supra* at ¶ 5. He filed a written response. He was represented by counsel at an oral hearing at which he admitted his misconduct. He was afforded an opportunity to file a post-hearing brief (and also granted additional time to file a reply brief). *See supra* at ¶ 6-20. Respondent received all process he was due, particularly in light of his admissions before the hearing panel. The majority recognizes that the underlying proceedings are not akin to the process required under Gov.Bar R. V; nevertheless, this only establishes that the instant matter is not an attempt to usurp those proceedings. This matter proceeded to establish, acknowledge, and vindicate the integrity of the judicial process in this court. Respondent was the beneficiary of the panoply of procedural and substantive due process securities the Constitution and the judicial

Case No. 2024-A-0040

system can offer. It would be difficult to imagine what additional procedural safeguards the dissent might demand.

## F. The Issue of "Crisis"

{¶129} The dissent finally objects to the majority's characterization of an "[e]merging [c]risis of AI [m]isconduct" and alleges the majority uses the crisis to justify overreach, i.e., the dissent asserts the majority's view is a mere Machiavellian way for the ends to justify the means. This is an improper characterization.

{¶130} The observation that AI related misconduct is proliferating in courts across the country is not a mere rhetorical statement, it is an empirical fact. The point of the "crisis" discussion is not that a crisis justifies extraordinary powers, but that the *ordinary* inherent authority of courts must be applied to *new* forms of misconduct as they evolve and arise. The submission of AI-generated fabrications to a court is a relatively new phenomenon, but the court's authority to address fraud upon a tribunal is ancient.

{¶131} The dissent's closing point—that "integrity in the courts should start with courts and judges exercising authority within lawful bounds"—is one with which the majority fully agrees. This court has exercised its authority within lawful bounds and afforded the respondent with fundamental procedural protection. We differ with the dissent's limiting estimation of our authority under the circumstances.

## VIII. CONCLUSION

{¶132} The rapid integration of artificial intelligence into the practice of law presents both extraordinary promise and extraordinary peril. AI tools, when used responsibly and under appropriate supervision, have the potential to improve access to justice, increase efficiency, and enhance the quality of legal services. But when AI tools are used without

verification, without supervision, and without the exercise of the independent professional judgment that is the hallmark of competent legal representation, the results can be devastating.

{¶133} This case illustrates the peril. An attorney who, by his own counsel's admission, was sophisticated in his understanding of AI tools permitted a non-attorney staff member to use a public generative AI platform to prepare an appellate filing. The AI tool fabricated transcript quotations—attributing specific, inflammatory statements to a real prosecutor that were never spoken. The attorney filed the document without verifying its contents. When the fabrications were identified, he did not correct the record. He appealed this court's denial of the tainted application to the Supreme Court of Ohio without disclosing the fabrications. He proffered an AI policy that itself appeared to have been generated by AI, complete with unfilled placeholder brackets. Two months after a sanctions hearing, a filing in another court bore the unmistakable hallmarks of unchecked AI output, including a ChatGPT prompt embedded in the text of a legal brief.

{¶134} This court does not write to condemn the use of artificial intelligence in the practice of law. To the contrary, this court recognizes that AI is an inevitable and potentially beneficial feature of modern legal practice. But the use of AI does not relieve an attorney of any of the obligations imposed by the Rules of Professional Conduct, by the rules of court, or by the oath of admission to the bar. An attorney who files a document containing AI-generated content is responsible for that content, fully and without qualification. The duty to verify, the duty of candor, the duty of competence, and the duty of supervision cannot be delegated to a machine.

{¶135} The sanctions imposed herein are proportionate, individually justified, and collectively designed to serve the purposes for which the court's sanctioning authority exists: to compensate for harm, to deter future misconduct, to protect the integrity of the judicial process, to preserve public confidence in the administration of justice, and to ensure that the practice of law remains a profession grounded in truth, accuracy, and candor.

ROBERT J. PATTON, J., concurs,

JOHN J. EKLUND, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

JOHN J. EKLUND, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶136} I agree that Respondent's conduct should be referred to the Office of Disciplinary Counsel, and I concur in our imposing a $2,000.00 fine paid to the Ashtabula County Prosecutor's Office for frivolous conduct. However, I respectfully dissent from the remainder of the Decision.

{¶137} Today, without statutory or rule-based authority, and without binding precedent to support doing it, we assert authority to act as the investigator, factfinder, and judge to adjudicate whether an Ohio lawyer has violated various Rules of Professional Conduct. The only basis for our doing so is asserted to be a court's "inherent authority."

{¶138} That courts have "inherent authority" cannot reasonably be gainsaid. *Ceol v. Zion Industries, Inc.*, 81 Ohio App.3d 286, 289 (9th Dist. 1992) (Courts "possess inherent power to do all things necessary to the administration of justice and to protect their own powers and processes" through the imposition of sanctions "against parties or

Case No. 2024-A-0040

their attorneys when the judicial process is abused."). However, its parameters are defined, in the absence of some federal constitutional mandate, by the laws and historical record of the state that constituted and governs the court. Yet, our ruling is grounded largely on federal court decisions addressing the authority of federal courts and non-Ohio state court decisions addressing the authority of non-Ohio state courts. These precedents do not bind us, much less define the scope of our authority.

{¶139} The first question, then, is whether the cases we cite and rely on (or anything else) support the proposition that this Court's inherent authority includes the authority to adjudicate violations of the Ohio Rules of Professional Conduct.

{¶140} We reference the contempt powers of the Court, finding Respondent's behavior to be "contemptuous and committed in violation of Civ.R. 11 and . . . sufficient to warrant sanctions under the court's inherent and contempt authority as well as Civ.R. 11." (Decision at ¶ 87).

{¶141} A finding of contempt is subject to review on two levels: "[f]irst, the contemptuous conduct must be examined to see whether it constituted a direct or indirect contempt. Second, the trial court's treatment of the matter must be analyzed in order to ascertain whether the contemnor was dealt with under the court's civil or criminal contempt powers." *In re Cox,* 1999 WL 1312688, *3 (11th Dist. Dec. 23, 1999). We do not engage in any examination or discussion of whether the contemptuous behavior before us constituted direct or indirect contempt, nor do we determine whether the sanctions imposed have been imposed as either civil or criminal sanctions. Although we find Respondent's conduct contemptuous, it is unclear to me that we find him in contempt

Case No. 2024-A-0040

at all. Instead, we appear to merely invoke the language of contempt for the imprimatur of authority it bestows.

{¶142} More concerning, we invoke Civ.R. 11 as a basis for our authority to issue sanctions. However, Civ.R. 11 only applies to original actions before this Court. *See State ex rel. Ware v. Vigluicci*, 2024-Ohio-5492, ¶ 7. It does not apply to conduct in appellate proceedings. *In re Estate of Garza*, 2016-Ohio-5531, ¶ 15 (10th Dist.); *State v. Baker*, 2023-Ohio-855, ¶ 17 (2d Dist.). Despite a footnote saying otherwise, we do not sit as a trial court over appellate proceedings to reopen an appeal. *See* App.R. 26(B); Eleventh Dist.Loc.R. 1; Decision at ¶ 48, fn. 1. Nor do I find the Ohio state precedent we rely on to be compelling. As outlined below, neither *Mentor Lagoons, Inc. v. Rubin*, 31 Ohio St.3d 256 (1987), *Royal Indemn. Co. v. J.C. Penney Co., Inc.*, 27 Ohio St.3d 31 (1986), *DiCuccio v. Lindsmith*, 2018-Ohio-2320 (10th Dist.), nor *Gamble v. Gamble*, 2025-Ohio-2381 (12th Dist.), addressed what we decide today. *See* Decision at ¶ 47-50. None of them condoned a definition of an Ohio court's "inherent authority" to include the power to find that a lawyer has violated the Ohio Rules of Professional Conduct and to impose any sanction for doing so. Why not? Because none of the lower courts in those proceedings had deigned to find such a violation and to impose any sanction based on it (whether under the Code of Professional Responsibility or the Rules of Professional Conduct).

{¶143} Conduct that justifies a court invoking its "inherent authority" could also warrant official discipline under the Rules of Professional Conduct and the Rules for the Government of the Bar and, I believe, vice versa. *See Royal Indemn.* at 34. That does not mean that a tribunal other than the Ohio Supreme Court can adjudicate and punish

violations of the Rules of Professional Conduct any more than it means that the Supreme Court can hold a lawyer in contempt for conduct before an inferior court.

{¶144} So, the Ohio cases we cite and rely on do not support the sweeping pronouncements we make today.

{¶145} *Mentor Lagoons*, 31 Ohio St.3d 256, is a case with a very narrow ruling, but we apply it expansively. It did not address a trial court's finding that an attorney violated any ethical rule, much less issuing sanctions for it. Instead, the case addressed "whether a trial court may summarily refuse to allow an attorney to testify in a case in which he is representing a litigant on the grounds that such testimony *may be* in violation of the Code of Professional Responsibility." (Emphasis added.) *Id.* at 257-258. The Ohio Supreme Court noted that DR 5-102 was not a "flat prohibition" against a lawyer testifying on behalf of the client. *Id.* at 258. The Court held that the ethical rules did not render such testimony inadmissible and that a trial court's refusal to allow a lawyer to testify can constitute prejudicial error. *Id.* at 259.

{¶146} Certainly, the Court noted that a trial court's inherent authority includes the "authority of dismissal or disqualification [of a lawyer] from a case *if* an attorney cannot, or will not, comply with the Code of Professional Responsibility." (Emphasis added.) *Id.* But, it also cautioned that this part of the lower court's inherent authority was "distinct from the *exclusive authority* of the Supreme Court of Ohio over attorney disciplinary proceedings and *does not conflict with such power.*" (Emphasis added.) *Id.*

{¶147} Likewise, in *Royal Indemn.*, 27 Ohio St.3d 31, the Ohio Supreme Court never said a lower court's "inherent authority" supplants the exclusive province of the Ohio Supreme Court over disciplining lawyers. *See id.* at 33. The trial court had revoked

Case No. 2024-A-0040

the pro hac vice status of an attorney for purposefully misleading opposing counsel about the existence of certain requested discovery documents. *Id.* at 36. The trial court found that the "misrepresentations amounted to egregious misconduct which could taint and diminish the integrity of future proceedings." *Id.* The trial court neither adjudged an ethical violation nor acted to sanction one.

{¶148} The Ohio Supreme Court did say that an attorney may be subject to disciplinary proceedings falling under the exclusive jurisdiction of the Ohio Supreme Court

> for the same conduct that led to a contempt citation or the revocation of his *pro hac vice* admission by the trial judge. . . . Therefore, revocation of *pro hac vice* admissions, disciplinary procedures and contempt sanctions are separate and distinct methods of addressing attorney misconduct, and the appropriateness of one is not dependent on the availability of another.

*Id.* at 34.

{¶149} *Royal Indemn.* does not support our findings of violations of the Ohio Rules of Professional Conduct or the expansive suite of sanctions we purport to impose today. Nor do *DiCuccio*, 2018-Ohio-2320 (10th Dist.), or *Gamble*, 2025-Ohio-2381 (12th Dist.). They both addressed only the assessment of attorney fees or financial sanctions for frivolous conduct. *DiCuccio* at ¶ 26, 30; *Gamble* at ¶ 26. Neither case determined that an attorney had violated an ethical obligation or imposed a sanction unrelated to the financial burden caused by the frivolous conduct, as today's judgment does.

{¶150} We need not, and do not, use this case to define comprehensively an Ohio court's "inherent authority." But, whatever it is, it does not include the authority to adjudicate a lawyer's alleged violation(s) of the Rules of Professional Conduct. Ohio has a framework, promulgated by our Supreme Court pursuant to power bestowed by our State Constitution and enabled by our state legislature, for addressing such allegations.

Case No. 2024-A-0040

*See* Gov.Bar R. V. That framework provides for extensive investigation, multiple levels of review clothed in procedural and substantive due process, evidentiary hearings, recommendations, and, ultimately, consideration and decision by the Supreme Court. And that framework, by its terms, mandates that "all . . . proceedings for the discipline of . . . attorneys . . . shall be brought, conducted, and disposed of in accordance" with its terms. Gov.Bar R. V(2)(A). It is the exclusive mechanism for disciplining attorneys in Ohio. We cannot and should not usurp that legal framework under the guise of exercising some amorphous "inherent" authority.

{¶151} Respondent filed a motion that asserted as fact things that are palpably and demonstrably untrue and swore to the Court by affidavit that they were true. He failed to withdraw the filing when it was rightfully and undeniably challenged. In doing so, he falsely aspersed fellow officers of the court and a trial court judge. His actions are a paradigm of contumacious indecorum and disrespect for the judicial process and this Court. We should sanction him; however, we cannot and should not adjudicate his culpability under the Rules of Professional Conduct.

{¶152} My dissent is further fueled by our purporting to impose sanctions on Respondent that go beyond what we are legally empowered to do. I do not question the imposition of the $2,000.00 fine paid to the Ashtabula County Prosecutor's Office for Respondent's conduct, nor do I question our referring Respondent's conduct to the Office of Disciplinary Counsel (although I do not understand why we need to announce it in a decision). But, we proceed to order, for example, Respondent (1) to serve upon any court in which he appears or practices a copy of our Decision; (2) to include a signed verification

with any filing he makes in any Ohio Court; (3) to complete continuing legal education; and (4) to write apology letters to a judge and lawyers.

{¶153} All of these sanctions exceed the "authority" we invoke to impose them. "Inherent" and contempt authority are, at bottom, tools "vested in courts *to manage their own affairs*." (Emphasis added.) *Link v. Wabash RR. Co.*, 370 U.S. 626, 630 (1962). I am unable to divine how compelled filings and verifications in other courts around the state, compelled continuing education, or compelled letter writing manages *our affairs.* Moreover, our contempt authority is, I believe, the authority to hold persons or entities in contempt and to punish accordingly. I am unaware of any circumstance in which a court can impose contempt sanctions on someone without having held them in contempt.

{¶154} Moreover, the reach of these orders is virtually statewide and arguably interferes with the legal authority (inherent or otherwise) of other Ohio courts. These orders purport to do nothing short of regulating and policing the practice of law throughout Ohio, which is the exclusive province of the Supreme Court of Ohio. Ohio Const., Art. IV, § 2(B)(1)(g).

{¶155} Perhaps most importantly, our findings and resulting sanctions deprive Respondent of even a vestige of substantive or procedural due process to which the Rules of Professional Conduct, the Rules for the Government of the Bar, and common decency entitle him.

{¶156} This overreach is not justified by any "Emerging Crisis of AI Misconduct" or a "crisis of integrity in the courts." Decision at ¶ 76-78. The integrity of or in the courts depends, as it always has, on the same things on which the integrity of any human

Case No. 2024-A-0040

institution depends: The human beings who function within them. The mechanisms, devices, or other tools they use do not cause mischief. All of them can be used for good or for ill; the character of the user is what makes the difference.

{¶157} Integrity in the courts should start with courts and judges exercising authority within lawful bounds. Today, in my view, we overstep those bounds. To do so in the name of a "crisis" is to suggest that "the ends justify the means." That is a way to foster a crisis, not avert it.

Case No. 2024-A-0040

# JUDGMENT ENTRY

For the reasons stated in the decision of this court, this court imposes the following sanctions:

### A. Monetary Sanction: $2,000 Fine, With Credit for $2,000 Already Paid

Respondent shall pay a monetary sanction in the amount of $2,000. Respondent shall receive credit for the $2,000 payment already made to the Ashtabula County Prosecutor's Office pursuant to the parties' settlement agreement.

### B. Referral to the Office of Disciplinary Counsel

This court refers respondent's conduct to the Office of Disciplinary Counsel of the Supreme Court of Ohio (ODC) for investigation.

The administrator of this court shall send a copy of this judgment entry, with a notation of referral, to the Office of Disciplinary Counsel via electronic mail upon its filing.

### C. Service Upon Courts and Judges for Two Years

For a period of two years from the date of this judgment entry, respondent shall serve a copy of this judgment entry upon the presiding judge or administrative judge of every court in which respondent files a new appearance, enters a new case, or otherwise undertakes representation. Such service shall be made within 14 days of respondent's first filing in each such court. Respondent shall file proof of such service with this court within seven days of serving each judge.

### D. Certification and Verification Requirements for Future Filings

For a period of two years from the date of this judgment entry, every filing submitted by respondent to any Ohio court shall include a signed certification that:

Case No. 2024-A-0040

(a) all citations to legal authority contained in the filing have been independently verified by the attorney of record as being real, accurately quoted, and still valid;

(b) all quotations attributed to any person, transcript, or document have been verified against the original source by the attorney of record;

(c) all factual representations contained in the filing have been verified by the attorney of record as having evidentiary support in the record or other reliable source;

(d) to the extent any portion of the filing was drafted with the assistance of a generative artificial intelligence tool, the attorney of record has disclosed the use of such tool and has independently verified all AI-generated content; and

(e) the attorney of record has personally reviewed the entire filing for accuracy, completeness, and compliance with all applicable rules.

## E. Mandatory Continuing Legal Education

Within 150 days of the filing of this judgment entry, respondent shall complete no fewer than six hours of continuing legal education ("CLE") specifically focused on the following topics: (a) the ethical use of artificial intelligence in the practice of law; (b) the professional responsibility implications of AI-generated content; (c) attorney supervision of nonlawyer assistants in the context of AI tools; and (d) candor toward the tribunal and the duty to verify filings. These CLE hours shall be in addition to, and not counted toward, respondent's regular biennial CLE requirements.

Respondent shall file proof of completion with this court within seven days of completing the required CLE. Respondent's counsel indicated at the August 28, 2025 hearing that respondent had voluntarily completed some CLE courses related to AI. While this court acknowledges and credits respondent's voluntary efforts, the CLE required by this order is a separate, mandatory obligation that must be fulfilled in its entirety.

Case No. 2024-A-0040

## F. Striking of the Application to Reopen

The application to reopen filed by respondent on May 19, 2025, is hereby stricken from the record of this court.

## G. Removal of Respondent as Counsel for Malikhi Jermaine Coleman

Respondent is hereby removed as counsel for Malikhi Jermaine Coleman in this case and in any related proceedings. Respondent shall take no further action on behalf of Mr. Coleman in this court.

Nothing in this order prevents Mr. Coleman from retaining new counsel or from pursuing any remedies to which he may be entitled, including but not limited to a new application to reopen supported by legitimate, verified legal authority. The new application to reopen shall be filed within 90 days of the filing of this judgment entry.

Respondent shall, within 14 days of the filing of this judgment entry, serve a copy of this order upon Mr. Coleman, together with a written explanation, in plain and understandable language, of the nature of respondent's misconduct and the reasons respondent has been removed as Mr. Coleman's counsel. Respondent shall inform Mr. Coleman that he has the right to retain new counsel or to proceed pro se and shall provide Mr. Coleman with the contact information for the Ohio Public Defender's Office and the Ashtabula County Public Defender's Office. Respondent shall file proof of such service and communication with this court within seven days of effectuating the same.

## H. Written Apologies to Persons Defamed by the Fabricated Filing

Respondent shall, within 30 days of the filing of this judgment entry, deliver written letters of apology to each of the following persons:

Case No. 2024-A-0040

(a) the Ashtabula County trial prosecutor who conducted the closing argument in *State v. Coleman*, for the false attribution of inflammatory statements that the prosecutor never made;

(b) the trial court judge who presided over *State v. Coleman*, for the implicit accusation that the judge permitted uncorrected prosecutorial misconduct; and

(c) the trial attorney and prior appellate counsel for Mr. Coleman on direct appeal, for the implicit accusations that they collectively failed to object to, and thereafter raise, a meritorious claim of prosecutorial misconduct.

Each of the four letters shall acknowledge that the statements attributed to these individuals, or the professional failures attributed to these individuals, in the application to reopen were false, were generated by an artificial intelligence tool, and were filed without verification. Each letter shall be accompanied by a copy of this judgment entry. Respondent shall file copies of the letters and proof of delivery with this court within seven days of sending the letters.

## COMPLIANCE AND ENFORCEMENT

Respondent shall comply fully and timely with each sanction imposed by this order. This court retains jurisdiction to enforce this order and to address any failure to comply.

Failure to comply with any provision of this order may result in contempt proceedings pursuant to R.C. 2705.02 and this court's inherent contempt authority. Contempt sanctions for noncompliance may include additional monetary fines, imprisonment, or both, as this court deems necessary to vindicate the authority of the court and to compel compliance.

Respondent shall maintain a record of compliance with each provision of this order and shall, upon request by this court, produce such records for review

Case No. 2024-A-0040

THE CLERK OF COURTS IS INSTRUCTED to STRIKE Malikhi Jermaine Coleman's May 19, 2025 application to reopen from the record of this appeal.

THE CLERK OF COURTS IS FURTHER INSTRUCTED to SERVE Malikhi Jermaine Coleman, PID#A811-740, North Central Correctional Institution, P.O. Box 1812, 670 Marion-Williamsport Road, East, Marion, OH 43301, with a time-stamped copy of this decision and judgment entry.

_____
JUDGE EUGENE A. LUCCI


_____
JUDGE ROBERT J. PATTON,
concurs


_____
JUDGE JOHN J. EKLUND,
concurs in part and dissents in part
with a Dissenting Opinion

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2024-A-0040